Paul D. LUCKETTE, Plaintiff,

v.

Samuel A. LEWIS, et al., Defendants.

No. Civ 94–1556–PCT–RGS (BGS).

United States District Court,
District of Arizona.

March 27, 1995.

472

Paul Dominick Luckette, Florence, AZ, pro se.

R. Elizabeth Teply, Ariz. Atty. Gen's. Office, Phoenix, AZ, for Samuel A. Lewis, George Herman, Charles Ryan, Denny Harkins, John Maliepaard, John R. Thompson.

## ORDER

STRAND, District Judge.

### INTRODUCTION

On July 28, 1994, Plaintiff Paul D. Luckette, presently confined in the Arizona State Prison Complex, Florence, Arizona, filed a *pro se* complaint and an Application for a Preliminary Injunction. A response and reply followed. On December 20, 1994, Plaintiff filed a Motion for a Temporary Restraining Order. A response followed. These motions are ready for disposition.

### FACTS

Plaintiff is an inmate incarcerated in an Arizona State Prison in Florence, Arizona. Plaintiff brings suit against prison officials Samuel A. Lewis, Charles Ryan, George Herman, Denny Harkins, John Maliepaard, and John Thompson ("Defendants" or "governmental defendants") pursuant to 42 U.S.C. § 1983, the First Amendment, and the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb. Plaintiff alleges that he is an "Ambassador/Priest" of the Freedom Church of Revelation. *See* Affidavit of Plaintiff in Support of Application/Motion for Preliminary Injunction ("Affidavit") at 1. Plaintiff states "I have been a member of the Church for several years and my beliefs are very deeply held and my practices are outlined in the Freedom Church Creed, Articles of Association, letters of directions and the Holy Bible." Affidavit at 1.

Plaintiff claims that Defendants have violated his constitutionally protected right to practice his religion. Specifically, Plaintiff points to four religiously required practices which are burdened by prison officials. Plaintiff alleges that his religion requires that he: (1) maintain a Kosher diet; (2) remain under a vow of poverty contract with his church; (3) not cut the hair on his head or face; and (4) wear a headcovering of red, white, black or any mixture of these colors.

Affidavit at 2. In his Motion for a Temporary Restraining Order and Application for a Preliminary Injunction, Plaintiff claims that he has been punished by prison officials because of his religious practices. Plaintiff has filed grievances with various prison officials requesting that he be allowed to practice his religion without penalty.

### DISCUSSION

Plaintiff Luckette brings this action based on the Free Exercise Clause of the First Amendment.[1] Based on the Court's review of the filings, oral argument, the evidence presented, and the relevant statutory and case law, the Court will grant in part and deny in part the Plaintiff's Application for a Preliminary Injunction.[2]

### PRELIMINARY INJUNCTION STANDARD

There are two factors to consider with respect to a motion for preliminary injunction: "The likelihood of the plaintiff's success on the merits; and, the relative balance of potential hardships to the plaintiff, defendant, and public." *Native Village of Quinhagak v. United States,* 35 F.3d 388 (9th Cir.1994) *quoting State of Alaska v. Native Village of Venetie,* 856 F.2d 1384 (9th Cir. 1988). Plaintiffs are entitled to a preliminary injunction if they show either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) the existence of serious questions going to the merits and the balance of hardships tipping [sharply] in [their] favor." *MAI Systems Corp. v. Peak Computers, Inc.,* 991 F.2d 511, 516 (9th Cir.1993), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Diamontiney v. Borg,* 918 F.2d 793, 795 (9th Cir.1990).

---

1. The First Amendment states that "Congress shall make no law ... prohibiting the free exercise [of religion]." In *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Supreme Court held that the Free Exercise clause applies to the states by incorporation into the Fourteenth Amendment.

2. The Motion for a Temporary Restraining Order ("TRO") will be denied as moot in that the Court's ruling on the Preliminary Injunction disposes of the requests for relief in the Motion for a TRO. To the extent that the Motion for TRO requests relief not requested in the Preliminary Injunction Application, this requested relief will be denied.

In other words, "[w]here a party can show a strong chance of success on the merits, he need only show a possibility of irreparable harm. Where, on the other hand, a party can show only that serious questions are raised, he must show that the balance of hardships tips sharply in his favor." *MAI*, 991 F.2d at 517 *quoting Bernard v. Air Line Pilots Ass'n, Intern., AFL–CIO*, 873 F.2d 213, 215 (9th Cir.1989). The critical inquiries for the Court are whether Plaintiff Luckette's constitutional claims will likely prevail on the merits, whether there is a probability of irreparable harm, and whether the hardships suffered by Plaintiff outweigh the Defendant's and the public's hardships. In undertaking these inquiries, the Court must closely analyze the Religious Freedom Restoration Act of 1993 ("RFRA" or "Act"), 42 U.S.C. § 2000bb.

### THE RELIGIOUS FREEDOM RESTORATION ACT

On November 16, 1993, Congress enacted the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb–4, which states in relevant part:

FREE EXERCISE OF RELIGION PROTECTED:

(a) IN GENERAL.—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) EXCEPTION.—Government may substantially burden a persons's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

---

3. Justice O'Connor concurred in the Judgment, but strongly criticized the Court's refusal to apply the "compelling interest test." *Smith*, 494 U.S. at 891–907, 110 S.Ct. at 1606–1615 (O'CONNOR, J., concurring).

4. The Court noted that:
   the only decisions in which we have held that the First Amendment bars application of a

Congress specifically stated that the purpose of the RFRA is to "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is a substantially burdened." 42 U.S.C. 2000bb.

In essence, Congress overturned the Supreme Court's decision in *Employment Div., Dep't. of Human Res. of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith*, the Supreme Court was confronted with the issue whether the Free Exercise Clause of the First Amendment prohibited the State of Oregon from applying its drug laws to the ceremonial ingestion of peyote. The Court, over the strong dissent of Justices Blackmun, Brennan, and Marshall[3], held that the Free Exercise Clause of the First Amendment does not require the Government to demonstrate a "compelling state interest" for each "valid and neutral law of general applicability" it enacts. *Smith*, 494 U.S. at 879, 110 S.Ct. at 1600 *citing with approval United States v. Lee*, 455 U.S. 252, 263, n. 3, 102 S.Ct. 1051, 1058, n. 3, 71 L.Ed.2d 127 (1982) (STEVENS, J., concurring in judgment). Thus, the Supreme Court held that the Free Exercise Clause does not prohibit Oregon from applying its drug laws to prohibit sacramental peyote use because the laws are "neutral laws of general applicability." *Id.*[4]

There is little doubt that the RFRA, with its "compelling state interest" test, applies to prisoners' religious claims. In analyzing a statute, a Court begins with its plain meaning. *See e.g. Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–1548, 79 L.Ed.2d 891 (1984). The RFRA clearly states that the compelling interest test controls free exercise claims. Based on the

---

neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press.... [citations omitted].
*Smith*, 494 U.S. at 881, 110 S.Ct. at 1601.

plain meaning of the statute, there is no ostensible limit to the types of free exercise claims that may be brought in a judicial proceeding. *See* 42 U.S.C. § 2000bb–1. Thus, the statute does not preclude prisoners from bringing claims based on the RFRA.

This conclusion is supported by the underlying purpose of the statute and the legislative history. *See e.g. United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (examining statutory purpose and legislative intent behind Title VII); *Also see* Eskridge and Frickey, LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY at 569–639 (analyzing courts use of statutory purpose and legislative history in construing statutes). The underlying purpose of the statute is to "restore the compelling interest test ... and guarantee its application in *all* cases where free exercise of religion is substantially burdened by government" [emphasis added]. 42 U.S.C. § 2000bb.

The legislative history of the RFRA further confirms that prisoner claims are covered by the statute. Congress debated an amendment that would have excluded prisoner claims from the purview of the Act and rejected it. *See* S.Rep. No. 111, 103rd Cong., 1st Sess. §§ V(d) and XI (1993); H.R.Rep. No. 88, 103rd Cong., 1st Sess. (1993)[5]. Moreover, the Senate Committee, which favorably reported a substantially identical version of the bill that finally passed, specifically addressed the issue of prisoner claims in their Committee Report. S.Rep. No. 111, 103rd Cong., 1st Sess. (1993) *reprinted in* 1993 U.S.C.C.A.N. 1892. The Committee overwhelmingly supported a substantially identical version of the RFRA, as is evidenced by their 15–1 vote to favorably report the bill. *See* S.Rep. No. 111, 103rd Cong., 1st Sess. (1993). The sole Senator voting against a favorable report was Senator Simpson. The Committee Report states, "the committee concludes the first amendment doctrine is sufficiently sensitive to the demands of prison management that a special exemption for prison free exercise claims

under the act is unnecessary." *Id.* at 11, 1993 U.S.C.C.A.N. at 1900, 1901. Senator Simpson placed his dissenting views in the Committee Report. The Senator's main contention was that if the RFRA applies to prisoner claims, there will be a dramatic increase in prisoner litigation which will unduly burden the courts' dockets. This contention is explicitly rejected in the Committee Report.

The plain meaning, statutory purpose, and legislative history of the RFRA clearly demonstrate that the Act applies to prisoner free exercise claims. Furthermore, the legislative history highlights the RFRA's intention to restore the traditional standard afforded to prisoner's free exercise claims which was weakened by the Supreme Court's decision in *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). *See* S.Rep. No. 111, 103rd Cong., 1st. Sess. (1993) at 9–11.

In *O'Lone*, the Supreme Court was confronted with the issue whether a prison policy, which prevented prisoners from attending a Muslim congregational service held on Friday afternoons, violated the prisoners' Free Exercise rights. *O'Lone*, 482 U.S. at 345–347, 107 S.Ct. at 2402–2404. The Court, over the dissent of Justices Brennan, Marshall, Blackmun and Stevens, held that the prison policy was reasonably related to legitimate penological objectives, and thus constitutionally permissible. *O'Lone*, 482 U.S. at 353, 107 S.Ct. at 2406–2407. The dissent in *O'Lone*, argued that the majority incorrectly applied a "reasonableness" test to all prisoner free exercise claims. *O'Lone*, 482 U.S. at 354–368, 107 S.Ct. at 2407–2414 (BRENNAN, J., dissenting). Justice Brennan's dissent states, "I ... would require prison officials to demonstrate that the restrictions they have imposed are necessary to further an important government interest, and that these restrictions are no greater than necessary to achieve prison objectives." *O'Lone*, 482 U.S. at 354, 107 S.Ct. at 2407 (BRENNAN, J., dissenting) *citing (Turner v. Safley*, 482 U.S. 78, 101, n. 1, 107 S.Ct. 2254, 2268, n.

---

**5.** The Amendment was offered on the floor of the Senate to make the Act inapplicable to prisoner cases. *See* Cong.Rec. for October 26, 1993,

S14353. The amendment was rejected by a vote of 58 to 41. *See* Cong.Rec. for October 27, 1993, S14468.

1, 96 L.Ed.2d 64 (1987) (STEVENS, J., concurring in part and dissenting in part) *citing Abdul Wali v. Coughlin*, 754 F.2d 1015 (2nd Cir.1985)).[6]

■ The RFRA, its purpose, and the legislative history make clear that Congress intended the courts to vigorously protect the First Amendment rights of prisoners while balancing the State's interest in maintaining a safe and orderly prison system. This Court is confronted with the difficult task of balancing Plaintiff Luckette's First Amendment rights with the State of Arizona's interests in effectively maintaining their prisons.

### BASIS FOR EQUITABLE RELIEF UNDER RFRA

■ Plaintiff Luckette requests the Court enter a preliminary injunction. Plaintiff is entitled to a preliminary injunction if he can show either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) the existence of serious questions going to the merits and the balance of hardships tipping [sharply] in [his] favor." *MAI Sys. Corp. v. Peak Computers, Inc.*, 991 F.2d 511, 516 (9th Cir.1993), *cert. dismissed*, —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994).[7] In order to demonstrate a likelihood of success on the merits Plaintiff must show that he will likely prevail based on the First Amendment and the RFRA. To prevail on the merits, Plaintiff must first demonstrate that the:

> governmental [action] burdens [the practice of his religion by preventing him] from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.

**6.** Although the dissenters stated they prefer the application of an "important government interest" test rather than a "reasonableness" test, they argued that prison policies preventing Muslim prisoners from worshiping at the Friday ceremonies are unconstitutional even based on the "reasonableness" test.

**7.** Plaintiff can establish either of these formulations. "These two formulations represent two points on a sliding scale in which the required

*Bryant v. Gomez*, 46 F.3d 948 (9th Cir.1995) *citing Graham v. C.I.R.*, 822 F.2d 844, 850–851 (9th Cir.1987) (internal citations omitted), *aff'd sub. nom. Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–2149, 104 L.Ed.2d 766 (1988). Plaintiff must demonstrate that his religion requires that he engage in the four religious requirements he alleges are burdened, and he must demonstrate that the burdens are substantial. To obtain a preliminary injunction on each of the four claims, Plaintiff must demonstrate that the Kosher diet, vow of poverty, hair length, and headcovering are each required by his religion, central to his religious doctrine, and substantially burdened. *Id.*

Second, in order to prevail on the merits, Plaintiff must demonstrate that the Defendants have not met their burden under the First Amendment and the RFRA. Specifically, Plaintiff must demonstrate that the governmental Defendants have substantially burdened his exercise of religion and have not established a "compelling governmental interest" or a "least restrictive means." *See* 42 U.S.C. § 2000bb–1.

Lastly, Plaintiff must demonstrate a possibility of irreparable injury. This burden may be met if Plaintiff can show that he will suffer irreparable harms from having his religious practices burdened. In addition, Plaintiff may also demonstrate that the "balance of hardships" tips sharply in his favor. *MAI Sys. Corp. v. Peak Computers, Inc.*, 991 F.2d 511, 516 (9th Cir.1993), *cert. dismissed*, —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994).

### LIKELIHOOD OF SUCCESS ON THE MERITS

■ Plaintiff must initially establish that his faith earnestly requires him to practice a Kosher diet, take a vow of poverty, keep his beard at a certain length, and wear a head-

degree of irreparable harm increases as the probability of success decreases." *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir.1990). The Court is mindful of the "sliding scale" approach and applies this standard to Plaintiff's claims. For convenience though, the Court refers to the first formulation because it most accurately describes Plaintiff's chances of success on the merits and the chances of irreparable injury.

covering of a particular color. Although courts should not pass judgment on which religions are *bona fide* and which are bogus, courts must be able to distinguish legitimate religions from "so called religions which tend to mock established institutions and are obviously shams and absurdities and whose members are patently devoid of [religious] sincerity." *Theriault v. Carlson*, 495 F.2d 390, 395 (5th Cir.1974), *cert. denied*, 434 U.S. 871, 98 S.Ct. 216, 54 L.Ed.2d 150 (1977). The Court is mindful of the Supreme Court's view that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989) (rejecting free exercise challenge to payment of income taxes alleged to make religious activities more difficult). Notwithstanding this admonition, the Court must make a preliminary inquiry in order to distinguish sham claims from sincere religious ones.

■ The Plaintiff has presented substantial documentation of the legitimacy of his religious convictions. Plaintiff has submitted an affidavit stating the sincerity of his religious beliefs and legitimacy of his church, the Freedom Church of Revelation. Plaintiff has also submitted an affidavit from Paula Cartright, Secretary of the Freedom Church, and the "Freedom Church Creed", which outlines the basic central tenets of Plaintiff's church. *See* Plaintiff's Application for Preliminary Injunction, Exhibit L. Most of the beliefs and practices in the "Creed" are derived from verses in the Bible, and are arguably based on Judeo–Christian principles. Although Plaintiff's religion may not be an "established" religion in the sense that it has millions of adherents or has been in existence for centuries, Plaintiff has demonstrated that his religion is principled and legitimate. In fact, each of the requests Plaintiff makes are "established" religious practices of various Judeo–Christian religions. Based on the filings, oral arguments, and the Court's review of Plaintiff's affidavit, the Freedom Church's Secretary's affidavit and the "Freedom Church Creed", the Court finds that Plaintiff's religious beliefs cannot be construed as

a "sham" or "devoid of religious sincerity." *Theriault* at 395. A court need not condone each and every practice or belief system of a religion in order to determine that a religion is legitimate and that its members are entitled to First Amendment protections.

■ Defendants have shown some concern that Plaintiff's religion is an "identity religion." *See* Plaintiff's Application for a Preliminary Injunction, Exhibit T. Identity religions generally profess violence against blacks, Jews, and other religious and ethnic groups. However, Plaintiff states that his religion does not profess violence against blacks, Jews or others. Moreover, the "Freedom Church Creed" specifically states:

> We are aware that "Identity" has taken on an anti-Semitic character among some groups. Therefore, we plainly state that we are not so-called "Jew haters", we do not believe that the Jews are responsible for all the world's problems, nor do we believe that the "holocaust" of World War II is a hoax. . . . We are in no way connected to or associated with the Aryan Nations, the KKK, the Skinheads, or any other race hate group of similar persuasion.

*See* Plaintiff's Application for Preliminary Injunction, Exhibit L. The Defendants have not presented the Court with any evidence that Plaintiff and his religion are committed to violence or profess hatred towards religious, ethnic or racial groups. Therefore, Defendants have failed to rebut Plaintiff's evidence demonstrating Plaintiff's sincere and legitimate religious beliefs.

This initial inquiry into the legitimacy of Plaintiff's religious convictions is an extremely important component of prisoner Free Exercise claims. Courts must be able to sort out the insincere and illegitimate prisoner Free Exercise claims from the legitimate ones, prior to undertaking an extensive First Amendment and RFRA analysis. This initial inquiry serves as a flood-gate for prisoner Free Exercise claims and provides an efficient means for disposing of bogus claims undeserving of First Amendment protections. *See* S.Rep. No. 111, 103rd Cong., 1st Sess. (1993) at 9–11.

The Court must next address Plaintiff Luckette's claims in light of the First Amendment and the RFRA. Plaintiff must show that the governmental defendants have "substantially burdened" his exercise of religion and that they have failed to establish a "compelling government interest" and the "least restrictive means." 42 U.S.C. § 2000bb–1. This Court finds very little guidance from the Ninth Circuit in applying the newly enacted RFRA. In one of the few cases involving a prisoner's Free Exercise claim pursuant to the RFRA, the Ninth Circuit did not reach the question of how to apply the "substantial burden" test because the Court held that the prisoner had not argued or provided evidence to show that his "religious practices" are mandated by his faith. *Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995). Plaintiff Luckette, however, has demonstrated that his religion requires that he maintain a Kosher diet, take a vow of poverty, keep his facial and head hair at a certain length, and wear headcovering of a particular color.

▮ Although the Plaintiff has demonstrated that his religion mandates the four religious practices he claims are burdened, Plaintiff has only demonstrated that three of the four have been *substantially* burdened. Prison policies do substantially burden Plaintiff's attempts to maintain a Kosher diet, keep his hair at a certain length, and wear a headcovering of a particular color. However, Plaintiff has not demonstrated how the religious practice of taking a vow of poverty has been *substantially* burdened. The "Creed" merely states that Plaintiff, as a priest in the Church, must "Turn over income to this Church (unless you have been appointed as an Ambassador, in which event you must turn over income to your chapter) to carry out the purposes of this church (also called a "vow of poverty")." *See* Plaintiff's Application for a Preliminary Injunction, Exhibit L. The Court finds no evidence that Defendants have substantially burdened Plaintiff's ability to take a vow of poverty.

Plaintiff believes that since he must turn over all of his money to his Church, that he is entitled to indigency status under the prison regulations. Prisoners are permitted to donate their money or spend their money on a variety of charities, interests, or churches; nevertheless, this does not mean that a prisoner who spends all his money on his religion or some other cause is entitled to "indigency status." Further, Plaintiff fails to demonstrate that his vow of poverty requires that he not work, or that the work requirement substantially burdens the practice of taking a vow of poverty. Based on the evidence presented and the filings, the Plaintiff has failed to demonstrate that his ability to take a vow of poverty has been substantially burdened.[8] Accordingly, Plaintiff's requests for equitable relief based on the vow of poverty claim will be denied.

▮ Plaintiff does show that the remaining practices have been substantially burdened. Plaintiff cannot effectively practice a Kosher diet, absent the approval of the Defendants, he is not allowed to wear his facial hair at the required length, and he is prevented from wearing a headcovering of appropriate color. The next issue for the Court to address is whether Plaintiff demonstrates that the governmental defendants have failed to establish a "compelling government interest" and the "least restrictive means." Plaintiff meets this burden by presenting evidence of the prison officials' inadequate responses to Plaintiff's requests to practice his religion. *See* Plaintiff's Application for Preliminary Injunction and Exhibits. Thus, the governmental defendants must demonstrate that the prison policies comport with the First Amendment and the RFRA. In applying the First Amendment and the RFRA to Plaintiff's case, the Court is guided

---

**8.** The Court does not reach the issue of whether the government has demonstrated a "compelling governmental interest" and "least restrictive means" in terms of the vow of poverty claim. Assuming that Plaintiff's ability to take a vow of poverty was substantially burdened, the Court notes that Defendants likely have established a "compelling governmental interest" and "least restrictive means." The prison system has compelling budgetary concerns and safety concerns which require that Plaintiff participate in work programs and not receive indigency status. There has been no evidence presented, and the Court is unaware of any such evidence, suggesting that any less restrictive means for accomplishing these important prison objectives exist.

by Justice Brennan's dissenting opinion in the *O'Lone v. Estate of Shabazz* case. The Court believes that Justice Brennan's dissent is the proper standard for applying claims brought pursuant to the RFRA. The Justice stated, "I ... would require prison officials to demonstrate that the restrictions they have imposed are necessary to further an important government interest, and that these restrictions are no greater than necessary to achieve prison objectives." *O'Lone,* 482 U.S. at 354, 107 S.Ct. at 2407 (BRENNAN, J., dissenting) (citations omitted). This standard is the same as the RFRA's "compelling interest/least restrictive means" test, and embodies the "balancing approach" articulated in the legislative history of the Act. *See* S.Rep. No. 111, 103rd Cong., 1st. Sess. (1993) at 9–11. Justice Brennan, relying on a Fifth Circuit case, states:

> [w]here exercise of the asserted right is not presumptively dangerous ... and where a prison has completely deprived an inmate of that right, then prison officials must show that 'a particular restriction is necessary to further an important governmental interest, and that the limitations on freedoms occasioned by the restrictions are no greater than necessary to effectuate the governmental objective involved.'

*O'Lone,* 482 U.S. at 358, 107 S.Ct. at 2409 (BRENNAN, J., dissenting) *citing Abdul Wali v. Coughlin,* 754 F.2d 1015 (2nd Cir. 1985). Prisoners' Free Exercise rights are constitutionally protected, and when there is no legitimate security risk justifying the infringement of this right, prison officials bear the heavy burden of demonstrating some other compelling state interest.

The logic of applying the compelling state interest test in prison situations is defended by Justice Brennan. The Justice states:

> [t]o the extent that prison is meant to inculcate a respect for social and legal norms, a requirement that prison officials persuasively demonstrate the need for the absolute deprivation of inmate rights is consistent with that end. Furthermore,

prison officials are in control of the evidence that is essential to establish the superiority of such deprivation over other alternatives. It is thus only fair for these officials to be held to a stringent standard of review in such extreme cases.

*O'Lone,* 482 U.S. at 359, 107 S.Ct. at 2410 (BRENNAN, J., dissenting).

Plaintiff Luckette has demonstrated that the prison has prevented him from practicing a Kosher diet, maintaining his hair at a certain length, and wearing a proper headcovering. He has written numerous requests to prison officials to permit him to practice his religion. *See* Plaintiff's Application for Preliminary Injunction and Exhibits. The prison's basic response to Plaintiff's request is that since the prison does not officially recognize Plaintiff's religion, he is not permitted a Kosher diet, an appropriate headcovering or hair length. *Id.* For example, Defendants conclusorily state, "Luckette is not claiming to be a Jew who keeps Kosher. Therefore, he is not entitled to claim a Kosher diet." Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction at 3. This is Defendants' primary basis for opposing Plaintiff's request for a Kosher diet. This does not suffice as a compelling government interest.[9]

■ In general, two of the most compelling penological interests are budgetary concerns and safety concerns. The Defendants have suggested at oral argument, though nowhere in the filings, that Kosher diets cost more money than regular prison diets. Although, the cost may be greater, this additional expense is not a compelling governmental interest. Only a few prisoners have legitimate religious beliefs which require they maintain a Kosher diet, and the expense of providing Kosher meals to these few prisoners is minimal. Moreover, the Ninth Circuit has held, under the less stringent *O'Lone* rational relationship test, that "[i]nmates have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their reli-

---

9. The Defendants' filings were so devoid of arguments and evidence suggesting "compelling government interests" and "least restrictive means" that the Court set for oral argument the Plain-

tiff's Application for a Preliminary Injunction, and specifically requested that the parties brief the Court on the application of the Religious Freedom Restoration Act to the Plaintiff's case.

gion." *McElyea v. Babbitt,* 833 F.2d 196, 198 (9th Cir.1987). The *McElyea* Court relied on a Second Circuit case, *Kahane v. Carlson,* 527 F.2d 492 (2nd Cir.1975), which held that the First Amendment requires that an Orthodox Jewish prisoner receive a Kosher diet. In *Ward v. Walsh,* 1 F.3d 873 (1993), *cert. denied,* — U.S. —, 114 S.Ct. 1297, 127 L.Ed.2d 649 (1994), also decided prior to the enactment of the RFRA, the Ninth Circuit reiterated that provision of a Kosher diet may be required by the First Amendment. In terms of the headcovering and hair length, the prison does not incur any cost by permitting Plaintiff to grow his hair or wear a headcovering.

Another potential compelling governmental interest is safety concerns. Clearly, provision of a Kosher diet would not implicate any safety concerns. However, the Defendants have suggested, albeit superficially and without much evidentiary documentation, that permitting an appropriate headcovering and hair length may raise safety concerns. In terms of the hair length, Defendants state that the prison policy concerning grooming and hair length has been upheld by the Ninth Circuit in "*Friedman v. State of Arizona,* 912 F.2d 328 (9th Cir.1990)." *See* Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction at 3. In *Friedman v. Arizona,* the Ninth Circuit held that a prison policy preventing Orthodox Jewish prisoners from growing their beards did not unconstitutionally restrict these prisoners' Free Exercise rights. *Id.* This Ninth Circuit decision, decided prior to enactment of the RFRA, was primarily based on the *O'Lone v. Estate of Shabazz* opinion. The *O'Lone* decision was implicitly, if not explicitly, overturned by the RFRA.

[redacted] Although there may be compelling reasons for not allowing prisoners to maintain extremely long hair, the Plaintiff is merely asking that he be allowed to maintain a beard one quarter of an inch in length. Prison officials permit, for medical reasons, some prisoners to maintain this one quarter inch beard length. *See* Plaintiff's Application for Preliminary Injunction. The prison officials do not meet their burden of demonstrating a compelling interest for not allowing a short, kempt beard. One might conclude that a six inch beard, or very long hair on one's head, may present a compelling health hazard or even be a security risk in certain situations, but a trimmed beard, so long as it is clean, does not seem to present prison authorities with a major security or health risk.

In the *Friedman* case, the Ninth Circuit relied on testimony suggesting that prisoners could not be identified if they were photographed without a beard, and then grew a beard and escaped. This problem may be easily rectified. If a prisoner has a legitimate and *bona fide* religious practice of wearing a short beard, which does not present a major health problem, then he can be photographed with his short kempt beard; this in fact may make it easier to identify this prisoner from those not having a beard. A prisoner who consistently requests a beard, and then shaves it off, clearly does not have a legitimate religious conviction, and thus his request may be denied as it would be a sham, not protected by the Free Exercise clause.[10]

[redacted] In terms of the headcovering, the Defendants have presented nothing in their filings, nor evidentiary documentation, to support the view that an appropriate headcovering may be a safety concern. The Defendants, however, did suggest at oral argument that certain colors may present safety concerns. The Defendants, at oral argument, suggested in passing that certain colors may be gang colors and thus the wearing of those colors may raise safety concerns. The Court is extremely concerned with the potential for violence that may arise from wearing gang-related colors. The Court must give due deference to the prison officials' expertise in determining which colors are gang colors and whether the wearing of such colors presents a safety risk. *See Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct.

10. If a prisoner claims that his religion requires he have a beard certain times of the year and not others, then the government would have a compelling interest in that the expense of photographing the prisoner each time and the potential of not being able to identify the prisoner, would present serious budgetary and safety concerns.

1800, 40 L.Ed.2d 224 (1974). Although the Plaintiff's religion may require him to wear only certain colors, this Court cannot condone endangering the welfare of individuals by permitting the Plaintiff to wear a headcovering, the color of which may result in harm to himself or others. These safety concerns, though, must be viewed in light of the First Amendment and RFRA. The governmental defendants have not clearly suggested which colors raise safety concerns. At oral argument, the Court was informed that prisoners are permitted to wear blue headcoverings. Plaintiff requests that he may wear a headcovering similar to the headcovering Native Americans are allowed to wear, but with the colors of red, white, black or some combination of the three. The Court was not informed as to which colors present safety problems. The Court is confident that the Defendants will be able to work with the Plaintiff in devising a headcovering that will not present a safety risk. Perhaps a primarily white headcovering, or a headcovering with some combination of the three colors, will not endanger Plaintiff or the welfare of other prisoners. The Court leaves it to the parties to agree on a headcovering. However, to the extent prison officials, based on their experience and expertise, legitimately believe there is no headcovering which will reasonably assure the Plaintiff's and others' safety, the Plaintiff may be precluded from wearing such duly designated dangerous headcoverings.

■ Further, the prison officials have failed to show that the "restrictions are no greater than necessary to achieve prison objectives." *O'Lone*, 482 U.S. at 354, 107 S.Ct. at 2407 (BRENNAN, J., dissenting) (citations omitted). The governmental defendants, in their filings and oral argument, have not addressed this issue. Assuming *arguendo* that Defendants established a compelling government interest as to all three practices, there has been no showing that the "application of the burden" is the "least restrictive means of furthering the compelling governmental interest." 42 U.S.C. § 2000bb–1. Plaintiff states and presents evidence that at least one other prisoner receives a Kosher diet, and that there are prison regulations permitting certain groups

this diet. *See* Application for Preliminary Injunction. Defendants do not present evidence to contradict this point or demonstrate why denying Plaintiff a Kosher diet is the least restrictive means for accomplishing their objective. Plaintiff also states and presents evidence that other groups are permitted to wear headcoverings. Plaintiff claims his headcovering is similar to a permissible Native American headcovering, except for the color. *Id.* As the Court has previously stated, the Court is confident that the parties can agree on a headcovering which will not present potential safety risks. Lastly, Plaintiff states and presents evidence that other prisoners are allowed to maintain short beards for medical purposes. *Id.* The Defendants do not establish their "least restrictive means" burden in this regard.

In sum, the Plaintiff has shown that his religious claims are sincere and that Defendants have failed to meet the requirements of the Free Exercise Clause of the First Amendment and the RFRA. Plaintiff has not shown that the governmental defendants have substantially burdened his practice of taking a vow of poverty, and accordingly, the Court will deny all relief requested, in the Application for Preliminary Injunction and Motion for Temporary Restraining Order, predicated on Plaintiff's vow of poverty claim. On the remaining claims, the Plaintiff has demonstrated a strong "likelihood of success on the merits." *MAI Sys. Corp. v. Peak Computers, Inc.*, 991 F.2d 511, 516 (9th Cir. 1993), *cert. dismissed*, —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994). The Court now turns to the second component of the preliminary injunction standard, the possibility of irreparable injury. *Id.*

## POSSIBILITY OF IRREPARABLE INJURY

■ The Plaintiff must show that there is a possibility of irreparable injury. *MAI Sys. Corp. v. Peak Computers, Inc.*, 991 F.2d 511, 516 (9th Cir.1993), *cert. dismissed*, —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994). In addition, the Plaintiff may, although need not, show that the balance of hardships tips sharply in his favor. *Id.* Plaintiff has provided ample evidence of

the hardships he has suffered and the irreparable harms he may suffer in the future. *See* Plaintiff's Application for a Preliminary Injunction. Plaintiff is not permitted to engage in religious practices which are mandated by his religion. In the context of a First Amendment free speech claim, the Supreme Court stated, "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The loss of an ability to practice a central tenet of one's religion for any extended amount of time is clearly an irreparable injury.

The Plaintiff has bolstered his "possibility of irreparable harm showing" with evidence that the "balance of hardships tips sharply in his favor." The Plaintiff is being prevented from exercising his religious beliefs and practices. The prison officials have not suffered and will not materially suffer if the Court enjoins the Defendants' specific actions which prevent Plaintiff from practicing a Kosher diet, maintaining his hair at an appropriate length, and wearing an appropriate headcovering. Therefore, based on the filings, the oral argument, the evidence presented, and the case law, the Court finds that the Plaintiff has demonstrated the possibility of irreparable harm, if not the probability of harm. The Court further finds that Plaintiff has demonstrated that the balance of hardships tips sharply in his favor.

## CONCLUSION

The Court will enter a preliminary injunction enjoining the Defendants from denying Plaintiff a Kosher diet and preventing Plaintiff from growing a one quarter inch beard and wearing an appropriate headcovering. As the Court has made clear, the Plaintiff has firmly established that his religious convictions are legitimate and sincere. The Court has closely examined the evidence relating to the *bona fides* of Plaintiff's religion and has found that his convictions are not pretensions or shams. Although courts should not judge the merits of religious convictions, an initial inquiry into the legitimacy of one's religious convictions is permissible under the First Amendment, and necessitat-

ed by the Court's duty to manage its scarce judicial resources. Illegitimate prisoner religious claims must be weeded from the legitimate ones. Congress's enactment of the RFRA may lead to a flood of bogus prisoner claims. This initial inquiry serves as the Court's flood-gate filtering out the insincere religious claims so that the Court has the resources to address legitimate fundamental First Amendment violations. Similarly, the requirement that a prisoner demonstrate that there is a *substantial* burden to a central religious belief serves this screening function.

Plaintiff has sufficiently demonstrated that three of the four religious tenets he complained of are central to his religion and have been substantially burdened by the prison officials. The governmental defendants have failed to adequately justify their imposition of these burdens. Accordingly, the Plaintiff's Motion for a Preliminary Injunction will be granted in part and denied in part.

Based on the foregoing,

**IT IS ORDERED,** granting in part and denying in part Plaintiff's Application for Preliminary Injunction (Doc. # 4).

**FURTHER ORDERED,** denying Plaintiff's Motion for Temporary Restraining Order as moot (Doc. # 25).

**FURTHER ORDERED,** denying all requested injunctive relief based on Plaintiff's "vow of poverty" claim.

**FURTHER ORDERED,** Defendants shall provide Plaintiff with the Kosher meals that are provided other similarly situated prisoners.

**FURTHER ORDERED,** Defendants shall permit Plaintiff to grow a beard of one quarter inch length, provided the beard is kempt and clean, and does not present any health problems to the Plaintiff or others.

**FURTHER ORDERED,** Defendants shall arrange to meet with Plaintiff and the parties shall agree on an appropriate headcovering which will not present safety concerns. However, to the extent prison officials, based on their experience and expertise, legitimately believe there is no headcovering which will reasonably assure the Plaintiff's and others'

safety, the Plaintiff may be precluded from wearing such duly designated dangerous headcoverings.