Ira W. MADISON Plaintiff,

v.

R. RITER, et al.   Defendants.

No.  CIV. 7:01CV00596.

United States District Court,
W.D. Virginia.
Roanoke Division.

Jan. 23, 2003.

Ira W. Madison, Dillwyn, VA, pro se.

Pamela Anne Sargent, Office of Atty. Gen., Richmond, VA, for defendants.

### MEMORANDUM OPINION

TURK, Senior District Judge.

Plaintiff, Ira W. Madison, is an inmate under the supervision of the Virginia Department of Corrections seeking relief under the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1 (2002), for the alleged violation of his right to free exercise of religion. In an August 23, 2002 opinion, the Court denied summary judgment on the Plaintiff's First Amendment claim, holding that there was a material factual dispute concerning the sincerity of the Plaintiff's religious beliefs. The Court also denied qualified immunity to the Defendants, finding that the constitutional standards governing the Defendants' conduct were clearly established.

The Court took Plaintiff's RLUIPA claim under advisement until the constitutionality of the Act could be briefed and argued. The Court heard oral arguments from the parties and the United States

Government as intervener, and the Defendants' Motion to Dismiss the Plaintiff's RLUIPA claim on the basis that the Act violates the United States Constitution is ripe for resolution.

## I

The facts of the present case are explained in detail in the Court's August 23, 2002, opinion. For purposes of this motion, a short review of the facts is appropriate. The Plaintiff claims to be a member of a particular sect of the Hebrew Israelite faith, based out of the Beth El Temple in Norfolk, Virginia. The Plaintiff argues that his faith requires him to consume a kosher diet, provided by the Department of Corrections in particular prison facilities under the name "Common Fare Diet."

The Plaintiff first requested the Common Fare Diet on July 27, 2000, while an inmate at Greenville Correctional Center. Local officials at the facility approved the request, but Central Classifications Services ("CCS"), a Richmond-based agency of the Virginia Department of Corrections which must review all such requests, overturned the approval upon the belief that Plaintiff had no compelling religious reason to participate in the diet, that he could satisfy his dietary needs from the regular food line, and that he had not shown a sincere belief in his religion. Plaintiff made a second request for the diet after his transfer to Bland Correction Center in March of 2001. Again, local officials approved the request but CCS reversed the decision and denied Plaintiff the diet. After his administrative appeals were denied within the prison system, the Plaintiff filed this suit on August 6, 2001.

## II
### The History of RLUIPA

On April 17, 1990, the Supreme Court of the United States decided *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), holding that the right of free exercise did not "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879, 110 S.Ct. at 1600. The Court clarified existing free exercise precedent by rejecting the applicability of the test developed in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), which established a strict scrutiny level of review for governmental actions that "substantially burden a religious practice," in the context of generally applicable laws.[1] *Sherbert*, 374 U.S. at 402–03, 83 S.Ct. at 1792–94. The Court was not concerned about the possible discriminatory effect of its decision on religious belief, reasoning that narrow and constitutional exemptions would be provided by Congress and state legislatures when necessary to protect religion. *Smith*, 494 U.S. at 890, 110 S.Ct. at 1606.

The Court's prediction was fulfilled, and perhaps exceeded in degree, just three years later, when Congress passed the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb (2002). The stated purpose of the Act is to "restore the compelling interest test as set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder* and to guarantee its application in all cases where free exercise of religion is

---

1. The Court was concerned about the dangerous effect that the application of strict scrutiny would have in invalidating generally applicable laws, as the power that the test would grant to a religious individual would allow the believer "to become a law unto himself," in contradiction of "both constitutional tradition and common sense." *Smith*, 494 U.S. at 885, 110 S.Ct. at 1603.

substantially burdened." 42 U.S.C. § 2000bb(b)(1). The Act consequently forbids the government from substantially burdening a person's exercise of religion, even in the case of generally applicable laws, unless the government can demonstrate that the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *Id.* § 2000bb–1(b).

The back-and-forth between Congress and the Supreme Court on the applicability of the *Sherbert* strict scrutiny test to laws of general applicability continued in 1997 when a challenge to the constitutionality of RFRA reached the Supreme Court in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Writing for a majority of the Court, Justice Kennedy held the Act unconstitutional as a violation of Congress's powers under § 5 of the Fourteenth Amendment. *Id.* Justice Stevens, concurring with the majority's opinion, wrote separately to voice his opinion that RFRA also violated the Establishment Clause of the First Amendment. *Id.* at 536–37, 117 S.Ct. at 2172. The reach of the Supreme Court's decision in *City of Boerne* has been the subject of much debate in the lower courts, as courts have disagreed as to whether *City of Boerne* invalidated RFRA as a whole or merely as it pertained to the states under § 5 of the Fourteenth Amendment. *Compare In re Young,* 141 F.3d 854 (8th Cir. 1998) (concluding that RFRA was only declared unconstitutional as it applies to the states), *with United States v. Sandia,* 6 F.Supp.2d 1278 (D.N.M.1997) (holding that the Court in *City of Boerne* held RFRA unconstitutional in its entirety). However, despite this confusion, it was clear in *City of Boerne* that the Court was continuing to resist the application of the *Sherbert* strict scrutiny test to allow individuals to avoid burdens imposed on religious belief by generally applicable laws. After *City of Boerne,* it was once again up to Congress to try and fashion such an exemption in a constitutional manner.

■ The Religious Land Use and Institutionalized Persons Act of 2000 represents Congress's attempt to reestablish RFRA's strict scrutiny standard while avoiding the constitutional infirmities that led to the invalidation of RFRA. Congress narrowed the reach of the strict scrutiny test in RLUIPA to zoning ordinances and institutionalized persons and avoided § 5 of the Fourteenth Amendment as the source of its authority to act, opting instead to use the Spending Power and the Commerce Clause. 42 U.S.C. § 2000cc–1(b)(1) & (2). At the same time, Congress made no changes to RFRA's strict scrutiny test, merely adopting the test in RLUIPA. Section 2000cc–1(a) of the Act, the section covering the claims of prison inmates, reads as follows:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

RLUIPA requires the inmate to bear the burden of persuasion concerning the substantial burden imposed on his religious exercise, and then, as in any strict scrutiny case, the government bears the burden of persuasion on the remaining elements of the test. *Id.* § 2000cc–2(b).[2]

---

**2.** The Plaintiff meets the substantial burden threshold under RLUIPA. The Plaintiff claims that a Kosher diet is mandated by his religion. In its August 23 opinion, the Court

The match between the judiciary and the legislature over the use of the *Sherbert* test continues to play out, as the question of the constitutionality of RLUIPA is presently before this Court. The answer to this question depends on the ability of Congress to cure the constitutional problems presented by RFRA in passing RLUIPA, despite the Supreme Court's strong suggestion in *City of Boerne* that the strict scrutiny test imposed by RFRA and RLUIPA has constitutional problems independent of Congress's power to enact such a statute.

## III

### The Constitutionality of RLUIPA

The Defendants claim that RLUIPA exceeds Congress's authority under the Spending and Commerce Clauses, and violates the Tenth Amendment, Establishment Clause, and the Separation of Powers. The Defendants' claims have been rejected by the few courts that have reviewed the constitutionality of RLUIPA. *See Mayweathers v. Newland*, 314 F.3d 1062, 2002 WL 31875409 (9th Cir.2002), *aff'g Mayweathers v. Terhune*, 2001 WL 804140 (E.D.Cal.); *Johnson v. Martin*, 223 F.Supp.2d 820 (W.D.Mich.2002); *Charles v. Verhagen*, 220 F.Supp.2d 955 (W.D.Wis. 2002); *Gerhardt v. Lazaroff*, 221 F.Supp.2d 827 (S.D.Ohio 2002). However, the backdrop of authority is not as unanimous in support of RLUIPA as it might seem. Several judges have come to the conclusion that the Supreme Court's invalidation of RFRA in *City of Boerne* extended beyond § 5 to condemn any use of the

*Sherbert* strict scrutiny test as a violation of the Separation of Powers or the Establishment Clause. *See, e.g., Sandia*, 6 F.Supp.2d 1278 ("*City of Boerne* stands ... for the proposition that in setting out to replace the constitutional test of Smith with one demanding higher scrutiny, Congress impermissibly crossed into the judiciary's Article III territory."); *Warner v. City of Boca Raton*, 64 F.Supp.2d 1272 (S.D.Fla.1999) (citing Justice Stevens' concurrence in *City of Boerne* for the proposition that RFRA "evidences a preference for religion which arguably runs afoul of the Establishment Clause of the First Amendment."); *In re Young*, 141 F.3d 854 (8th Cir.1998) (Bogue, S.J., dissenting) ("I would hold that RFRA is unconstitutional even as applied to federal law, and on that basis affirm the district court.").

The United States disagrees with the courts that have interpreted *City of Boerne* broadly to invalidate any application of strict scrutiny to laws of general applicability and argues that the narrower reach of RLUIPA and its passage under the Spending and Commerce Clause cured the infirmities that rendered RFRA unconstitutional. With due respect to the courts that have found RLUIPA constitutional, this Court is of the opinion that RLUIPA's application of the *Sherbert* strict scrutiny standard to the free exercise claims of religious inmates is a clear violation of the Establishment Clause, having the primary effect of advancing religion above other fundamental rights and conscientious beliefs.[3]

reserved for trial the issue of Plaintiff's sincerity of belief. Assuming that the Plaintiff's belief is sincere, prohibiting him from receiving the diet places a substantial burden on his religious exercise. As the Court's August 23 opinion explains, the Defendants have failed to prove as a matter of law that there is a

rational reason for denying the diet, let alone a compelling one.

3. In this opinion, the Court addresses 42 U.S.C. § 2000cc–1, the section of RLUIPA pertaining to institutionalized persons and not the portions of RLUIPA dealing with zoning laws.

## A

### The Establishment Clause

The First Amendment to the Constitution provides that "Congress shall make no law respecting an establishment of religion." This language has been interpreted by the Supreme Court to guard against laws that promote all religions equally, in addition to laws that attempt to promote one particular religion over all others. *See Bd. of Educ. of Kiryas Joel Village School Dist. v. Grumet,* 512 U.S. 687, 696, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994); *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 8, 109 S.Ct. 890, 896, 103 L.Ed.2d 1 (1989); *Everson v. Bd. of Educ. of Ewing Township,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947) ("Neither a state nor a Federal government ... can pass laws which aid one religion, aid all religions, or prefer one religion over another."). The Establishment Clause requires the courts to be vigilant against establishments, as "[a] law 'respecting' the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not establish a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971).

However, vigilance is not synonymous with antipathy. The so-called wall that separates church and state is anything but impenetrable, as total separation has been recognized by the Supreme Court and Fourth Circuit to be a mythical, and perhaps dangerous, objective. *See Lynch v. Donnelly,* 465 U.S. 668, 672, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984); *Lemon,* 403 U.S. at 614, 91 S.Ct. at 2112; *Brown v. Gilmore,* 258 F.3d 265, 275 (4th Cir.2001). Due to the counter-pressures asserted by the interplay of the Establishment and Free Exercise Clauses, it is permissible, and sometimes required, for Congress to legislate with respect to religion. *See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 335, 107 S.Ct. 2862, 2867, 97 L.Ed.2d 273 (1987); *Texas Monthly,* 489 U.S. at 10, 109 S.Ct. at 897; *Lynch,* 465 U.S. at 673, 104 S.Ct. at 1359.

Congress is not without any guidelines to act in the area of religious belief, however, as the Supreme Court has established as a fundamental requirement of the Religion Clauses the necessity of legislative neutrality towards religious belief. *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 2014, 138 L.Ed.2d 391 (1997); *Rosenberger v. Rector and Visitors of the University of Va.,* 515 U.S. 819, 846, 115 S.Ct. 2510, 2525, 132 L.Ed.2d 700 (1995) (O'Connor, J., concurring) ("Neutrality, in both form and effect, is one hallmark of the Establishment Clause."); *Kiryas Joel,* 512 U.S. at 705, 114 S.Ct. at 2492 (stating that the Religion Clauses "command[ ] neutrality"); *Wallace v. Jaffree,* 472 U.S. 38, 50, 60, 105 S.Ct. 2479, 2486, 2491, 86 L.Ed.2d 29 (1985); *Comm. for Public Educ. and Religious Liberty v. Nyquist,* 413 U.S. 756, 792–93, 93 S.Ct. 2955, 2975, 37 L.Ed.2d 948 (1973) ("A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion."). The concept of neutrality is often ill-defined in case law, but the Supreme Court has explained that, at the least, neutrality compels the state to act with equal regard to each fundamental freedom guaranteed by the First Amendment, placing no right above or below another. *See Wallace,* 472 U.S. at 50, 105 S.Ct. at 2486 ("If by this position appellant seeks for freedom of conscience a broader protection than for freedom of the mind, it may be doubted that any of the great liberties insured by

the First Article can be given higher place than the others. All have preferred position in our basic scheme." (*quoting Prince v. Mass.*, 321 U.S. 158, 164, 64 S.Ct. 438, 441, 88 L.Ed. 645 (1944))).

Neutrality is an effective guideline for constitutional state action, because it incorporates the concept of "benevolent neutrality," recognizing that government may provide benefits to religion with facially neutral exemptions and benefits. *See Kiryas Joel*, 512 U.S. at 705, 114 S.Ct. at 2492; *Amos*, 483 U.S. at 334, 107 S.Ct. at 2867–68. Therefore, a governmental accommodation of religious exercise, such as the one provided by RLUIPA, is not *per se* invalid as an establishment of religion despite granting protections going beyond what the Free Exercise Clause would otherwise require. *See Amos*, 483 U.S. at 334, 107 S.Ct. at 2867. The question for a court in analyzing the constitutionality of an accommodation of religion is whether the accommodation goes too far in protecting religious belief and devolves into "an unlawful fostering of religion." *Id.* at 334–35, 107 S.Ct. at 2868.

The answer to this question, often an unclear and ambiguous inquiry, can be sharpened somewhat by the use of the three-part inquiry established in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745. In *Lemon*, the Supreme Court delineated three tests for a court to use in deciding whether a particular statute is constitutional under the Establishment Clause: (1) "The statute must have a secular legislative purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; (3)

the statute must not foster an excessive government entanglement with religion." *Id.* at 612–13, 91 S.Ct. at 2111. In *Agostini v. Felton*, the Court simplified the test, suggesting that a court's inquiry under the second and third prongs of the *Lemon* inquiry was substantially the same, and placing the search for excessive entanglement under the inquiry into impermissible effects. 521 U.S. at 232–33, 117 S.Ct. at 2015.

In evaluating the constitutionality of congressional action under the *Lemon* inquiry, the search for impermissible effects and excessive entanglement has often proved to be the most critical test. *See, e.g., Estate of Thornton, v. Caldor, Inc.*, 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985); *Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948; *Lemon*, 403 U.S. 602, 91 S.Ct. 2105. It is this aspect of the inquiry that sheds light on the greatest Establishment Clause problems presented by RLUIPA, and it will therefore be the focus of the Court's constitutional analysis.[4]

## B

### The Principal and Primary Effect of RLUIPA is to Advance Religion by Elevating Religious Rights Above All Other Fundamental Rights

In 1987, the Supreme Court, in two landmark decisions, developed a "rational-relationship" test to govern an inmate's claim that a prison regulation or action of a prison administrator burdens his constitutional rights. *See Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64, and

---

4. The search for a secular purpose is not a particularly strict inquiry, as the secular purpose prong can be satisfied even if legislation is motivated in part by a religious purpose. *See Wallace*, 472 U.S. at 56, 105 S.Ct. at 2489; *Brown*, 258 F.3d at 277. The Supreme Court has already held that the stated secular purpose of RLUIPA, to protect the free exercise of religion, is a permissible secular purpose, even if there is some question as to whether the purpose is in fact genuine. *See Amos*, 483 U.S. at 335, 107 S.Ct. at 2868. However, a valid secular purpose does not prevent the Act from going too far and having the primary effect of advancing religion. *See id.* at 334–35, 107 S.Ct. at 2868.

*O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282.[5] The test requires a court, in evaluating the merits of such a claim, to take into account four factors: (1) Whether there exists a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) whether "there are alternative means of exercising the right that remain open to prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) the "absence of ready alternatives" to the prison regulation.[6] *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2262.

The *Turner* rational relationship test represents a balance between the need to recognize the continuing vitality of the constitutional rights of inmates, and the fact that incarceration necessarily involves a retraction of some rights. *See O'Lone*, 482 U.S. at 348, 107 S.Ct. at 2404. However, the test is not a perfect balance, as, in establishing a reasonableness inquiry for the protection of constitutional rights, the test errs on the side of deference to the reasoned judgment of prison administrators. *See id.* at 349–50, 107 S.Ct. at 2404–05. This deference is a product of the experience of prison administrators combined with the limitations of the judiciary that make the courts "ill-suited" to control the administration of the prison system. *See id.; Turner*, 482 U.S. at 84–85, 107 S.Ct. at 2259. The Supreme Court in *Turner* flatly rejected the application of a strict scrutiny analysis to prisoner constitutional claims, as "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovate solutions to the intractable problems of prison administration." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2262. The Court worried that strict scrutiny would force the judiciary to run the prison system, thereby eviscerating the necessary deference due prison officials. *Id.*

Before RLUIPA, the deference in *O'Lone* and *Turner* to the decisions of prison administrators applied equally to all claims based on the violation of fundamental rights,[7] including, among others,

---

**5.** The Fourth Circuit has recognized the possibility that the Supreme Court's decision in *Employment Division, Dept. of Human Resources of Oregon v. Smith* established a different standard of review for the constitutionality of generally applicable prison regulations. *See Hines v. South Carolina Dept. of Corrections*, 148 F.3d 353 (4th Cir.1998). However, the Fourth Circuit has not yet ruled on this question, and it continues to apply the *Turner* test to such regulations. *See id.* The use of the *Smith* test in evaluating the constitutionality of a segment of prison regulations would not affect this Court's analysis of the constitutionality of RLUIPA, as the strict scrutiny standard imposed by RLUIPA would still represent a drastic increase in the level of protection afforded religious rights relative to the protection afforded other fundamental rights under either the *Turner* or *Smith* analysis.

**6.** While the absence of ready alternatives is evidence of reasonableness, this factor does not establish a least restrictive means requirement. The Court explained that "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.*

**7.** The reach of *Turner* does not stop at the First Amendment, as the Supreme Court has made it clear that the *Turner* "rational relationship" standard applies to all cases in which "a prisoner asserts that a prison regulation violates the Constitution" and "all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990); *see also Thompson v. Souza*, 111 F.3d 694 (9th Cir.1997). However, the Supreme Court continues to apply highly deferential standards other than *Turner* to a limited class of inmate

free speech claims, *Amatel v. Reno*, 156 F.3d 192 (D.C.Cir.1998), claims concerning the right to marry, *Turner*, 482 U.S. 78, 107 S.Ct. 2254, the right to privacy, *Oliver v. Scott*, 276 F.3d 736 (5th Cir. 2002), the right of meaningful access to the courts, *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), and discrimination on the basis of race, *Morrison v. Garraghty*, 239 F.3d 648 (4th Cir.2001). In addition to applying to such claims equally, the *Turner* test applied the same extraordinary amount of deference to prison officials' judgments, making each inmate's constitutional claim an uphill struggle in the courts. *See, e.g., Giano v. Senkowski*, 54 F.3d 1050, 1055 (2d Cir.1995) (defining content-neutral prison regulations as regulations whose "purpose is to maintain prison security and decrease violence" and upholding right of prison administrators to evaluate content on case-by-case basis); *see also Farmer v. Perrill*, 288 F.3d 1254, 1261 (10th Cir.2002) (describing the manner in which courts have been "extremely deferential" to the views of prison administrators); *Nolley v. County of Erie*, 776 F.Supp. 715 (W.D.N.Y.1991) (noting how prison officials are due "substantial deference" in deciding whether a prison regulation is rationally related to a legitimate penological interest). This level of deference makes many legitimate constitutional claims, which would otherwise be successful when brought outside the prison context under a strict scrutiny level of review, likely to fail when brought by inmates. *See In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 468 (4th Cir.1999) (noting how an unconstitutional law outside of a prison may be held constitutional when challenged by an inmate); *Fraise v. Terhune*, 283 F.3d

506, 515 n. 5 (3d Cir.2002) (*"Turner* discussed five prior Supreme Court cases involving inmate constitutional claims, and in all of those cases the challenged prison regulation would have been plainly unconstitutional outside the prison context."); *Giano v. Senkowski*, 54 F.3d at 1053 ("The *Turner* test has been routinely invoked to uphold prison policies restricting First Amendment rights that would not be permissible outside the prison context.").

The right to free exercise of religion did not escape the reach of *Turner*. In *O'Lone*, the Supreme Court upheld the rational relationship test as the appropriate standard for inmates' claims under the Free Exercise Clause, despite the unquestionably burdensome effect of the challenged prison regulation on the religious exercise of Muslim inmates. 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282. Thus, like other fundamental rights that inmates retain in prison, the right of inmates to be free from burdens imposed on religious exercise by prison regulations was drastically circumscribed by the rational relationship test. *See id.; In re Five Percenters*, 174 F.3d 464 (upholding prison's classification of self-described religious group as a security threat group under *Turner* ); *DeHart v. Horn*, 227 F.3d 47 (3d Cir.2000) (denying religious diet under *Turner* on the speculative basis of inmate jealousy); *Salaam v. Collins*, 830 F.Supp. 853 (D.Md.1993) (holding that cost concerns satisfy the *Turner* test).

■ While the judiciary saw fit to treat religious rights the same as other fundamental rights under *Turner*, Congress viewed these rights differently in passing RLUIPA. RLUIPA singles out religious rights from the fundamental rights encom-

---

constitutional claims, including inmate claims under the Eighth Amendment. *See Farmer v.*

*Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

passed within the *Turner* test and establishes a drastically increased level of protection for such rights. Under RLUIPA, prison regulations that substantially burden religious belief, including those that are generally applicable and facially neutral, are judged under a strict scrutiny standard, requiring prison officials, rather than the inmate, to bear the burden of proof that the regulation furthers a compelling penological interest and is the least restrictive means of satisfying this interest. 42 U.S.C. § 2000cc–1. As is well known from the history of constitutional law, the change that RLUIPA imposes is revolutionary, switching from a scheme of deference to one of presumptive unconstitutionality. *See Smith,* 494 U.S. at 888, 110 S.Ct. at 1605. Instead of rational, the penological interest under RLUIPA must be of the highest order, *see Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Jenkins v. Angelone,* 948 F.Supp. 543, 546 (E.D.Va. 1996); instead of focusing on the prison inmate's ability to find other avenues to exercise his belief, a court is required to focus on the prison administrator's choice among regulatory options, *see* 42 U.S.C. § 2000cc–1(a)(2); instead of placing the burden of proof on an inmate, RLUIPA throws the burden on prison officials, *see id.* § 2000cc–1(a). It is hard to imagine a greater reversal of fortunes for the religious rights of inmates than the one involved in the passage of RLUIPA.

What makes this increased level of protection for religious rights, and religious rights only, constitutionally questionable is the fact that there is no demonstrable evidence that religious constitutional rights are at any greater risk of deprivation in the prison system than other fundamental rights. While the supporters of RLUIPA, in arguing for the passage of the Act, noted that "some institutions restrict religious liberty in egregious and unnecessary ways" as a result of either "indifference,

ignorance, bigotry, or lack of resources," *see* Statements of Senators Hatch and Kennedy, 146 Cong. Rec. S7774–01, S7775 (2000), they never made the claim that other fundamental rights held by inmates are not similarly threatened by prison administrators. Indifference, bigotry, and cost concerns have the same restrictive effect on the freedom of speech, the ability to marry, the right to privacy, and countless other freedoms that RLUIPA proponents left to a lesser level of protection under *Turner. See, e.g., Cornell v. Woods,* 69 F.3d 1383 (8th Cir.1995) (discussing retaliatory acts of prison officials in response to prisoner's exercise of his First Amendment rights); *Burton v. Livingston,* 791 F.2d 97 (8th Cir.1986) (decrying bigoted death threats made by prison guard to inmate in retaliation for inmate's exercise of his due process and First Amendment rights); *Little v. Terhune,* 200 F.Supp.2d 445 (D.N.J.2002) (analyzing a prison's inability to provide completely equal access to educational program due to cost concerns). RLUIPA supporters also ignore the fact that the Supreme Court has already considered the effect of bigotry and indifference on the exercise of religion in penal institutions and has held that strict scrutiny is not required by the Free Exercise Clause to protect religious belief from the burden imposed by prison regulations. *See O'Lone,* 482 U.S. 342, 107 S.Ct. 2400. The only standard that is *required* by the Constitution to protect the religious belief of inmates is the same as the standard used to protect other fundamental rights held by inmates: the rational relationship test. *See O'Lone,* 482 U.S. 342, 107 S.Ct. 2400.

If the reach of RLUIPA had been limited to prison regulations that specifically targeted and discriminated against religious belief, it would be much more difficult to decide the Act's constitutionality. However, RLUIPA extends far beyond regulations targeting religion, protecting

religious inmates against even generally applicable and facially neutral prison regulations that have a substantial effect on a multitude of fundamental rights. *See* 42 U.S.C. § 2000cc–1(a). Such protections give religious rights a substantially greater level of protection than other fundamental rights held by inmates. Assume, for example, that a prison official confiscates white supremacist literature held by two different inmates. One inmate is a member of the Aryan Nation solely because of his fanatical belief that a secret Jewish conspiracy exists to control the world. The second inmate holds the white supremacist literature because he is a member of the Church of Jesus Christ Christian, Aryan Nation ("CJCC"). The non-religious inmate may challenge the confiscation as a violation of his rights to free expression and free association. A court would evaluate these claims under the deferential rational relationship test in *Turner*, placing a high burden of proof on the inmate and leaving the inmate with correspondingly dim prospects of success. *See Haff v. Cooke*, 923 F.Supp. 1104 (E.D.Wis. 1996). However, the religious inmate, as a member of the CJCC, may assert a RLUIPA claim, arguing that the confiscation places a substantial burden on his religious exercise. The religious white supremacist now has a much better chance of success than the non-religious white supremacist, as prison officials bear the burden of proving that the prison policy satisfies a compelling interest and is the least restrictive means of satisfying the interest. *See id.* at 1115 ("If this court applied a RFRA test more stringent than the *Turner* test, this court would force prisons to favor prisoners' religious material over their secular

material because prisons would need a better justification to confiscate religious material than political material.").[8] The difference in the level of protection provided to each claim lies not in the relative merits of the claims, but lies instead in the basis of one claim in religious belief. *See id.* (holding that, applying a strict scrutiny standard under RFRA, the plaintiff "would possess the white supremacist material solely because of its relation to exercising his religious, as opposed to his political, rights.").

■ The singling out of religious belief as the one fundamental right of prisoners deserving of legislative protection rejects any notion of congressional neutrality in the passage of RLUIPA. In the absence of any proof that religious rights are more at risk in prison than other fundamental rights, and with the knowledge that strict scrutiny is not required to protect the religious belief of prisoners under the Free Exercise Clause, Congress acted only to protect religious rights. Such an action, while labeled a neutral "accommodation," is not in fact neutral at all, and the Court is not allowed to defer to the mere characterization of RLUIPA as such. *See Wallace*, 472 U.S. at 82, 105 S.Ct. at 2503 (O'Connor, J., concurring) ("Judicial deference to all legislation that purports to facilitate the free exercise of religion would completely vitiate the Establishment Clause. Any statute pertaining to religion can be viewed as an accommodation of free exercise rights."). The burden placed on religious inmates in prisons is not, as in *Amos*, one that had been placed on them by an act of Congress specifically limiting free exercise rights [9]. 483 U.S. 327, 107

8. The *Haff* court eventually found the actions of prison officials not to be a violation of RFRA, but only because the court felt constrained by the Establishment Clause to equate the strict scrutiny test under RFRA with the rational relationship test of *Turner*.

This is not the normal approach followed by courts under RFRA and RLUIPA.

9. The courts that have upheld the constitutionality of RLUIPA have relied heavily on the Supreme Court's decision in *Amos*, arguing

S.Ct. 2862, 97 L.Ed.2d 273. Instead, prison inmates exist in a society of universally limited rights, one that is required by the nature of the institution. When Congress acts to lift the limitations on one right while ignoring all others, it abandons a position of neutrality towards these rights, placing its power behind one system of belief. *See Wallace*, 472 U.S. at 50, 105 S.Ct. at 2486; *see also Haff*, 923 F.Supp. 1104, 1116 ("The Establishment Clause and the Free Speech Clause require [prison officials] to treat religious material no worse and no better than secular material."). When the one system of belief protected is religious belief, Congress has violated the basic requirement of neutrality embodied in the Establishment Clause.

While Congress could constitutionally legislate to raise the level of protection for all of the fundamental rights of prisoners, doing so only for the right to religious exercise when all fundamental rights are equally at risk in the prison system has the principal effect of raising religious rights to a position superior to that of all other rights held by prisoners. As a result, RLUIPA has the principal and primary effect of advancing religious belief.

---

that RLUIPA is merely another example of benevolent governmental neutrality. However, *Amos* dealt with the lifting of an affirmative burden placed primarily on religious institutions, in that Title VII's prohibitions on hiring or firing on the basis of religion had a much greater negative impact on the purpose and mission of a religious organization in comparison to the effect of the prohibitions on a secular institution. When a religious organization cannot organize itself on the basis of religion, such a limitation runs counter to the requirements of the Free Exercise Clause. *See Amos*, 483 U.S. at 341–42, 107 S.Ct. at 2871 (Brennan, J., concurring) ("The authority to engage in this process of self-definition inevitably involves what we normally regard as infringement on free exercise rights, since a religious organization is able to condition employment in certain activities on subscription to particular religious tenets.").

The majority in *Amos* recognized the constitutional necessity of providing such an exemption, arguing that limiting the Title VII exemption solely to the religious activities of religious employers would still "affect the way an organization carried out what it understood to be its religious mission." *Id.* at 336, 107 S.Ct. at 2868. Thus, the purpose of the exemption in *Amos* was to "minimize government 'interfer[ence] with the decision-making process in religions.'" *Id.* (alteration in original). When this interference is lifted, the church is the entity that discriminates on the basis of religious belief, not the government itself. *See id.* at 337, 107 S.Ct. at 2869.

Unlike the exemption held constitutional in *Amos*, RLUIPA requires the government *itself*, through the actions of prison administrators, to accommodate religious inmates to a greater degree than non-religious inmates. *See id.* at 337 n. 15, 107 S.Ct. at 2869 n. 15. In addition, while the Free Exercise Clause arguably required Congress to provide a religious exemption to Title VII in order to alleviate "governmental interference" with the decision-making process of a religious institution, the Supreme Court in *O'Lone* has specifically held that a strict scrutiny standard is not required by the Free Exercise Clause to protect inmates from regulations that have the effect of burdening their religious belief. *See* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282.

The difference between *Amos* and RLUIPA is, like all Establishment Clause cases, a question of degree. However, the difference in degree between the two is substantial, and congressional neutrality is the line that divides them. When Congress has acted to impose an affirmative burden on religion, it is necessary for Congress to remove that burden in order to retain a position of neutrality towards religious belief. However, when Congress acts to provide religious inmates, and only religious inmates, with a level of constitutional protection that the Supreme Court has deemed unnecessary to protect religious rights, it has gone beyond protecting religion to affirmatively advancing it.

## C

### The Impermissible Effect of RLUIPA in Promoting Religion Has a Direct Effect on the Status of Religious and Non-religious Inmates in Prison Society

■ The danger in privileging religious rights over all other fundamental rights can be seen in the way in which the greater protections offered by RLUIPA place religious individuals in a position of privilege relative to non-religious individuals in prison.

■ As discussed previously in this opinion, only interests of the highest order may satisfy the compelling interest standard of the strict scrutiny test.[10] If " 'compelling interest' really means what it says ... many laws will not meet the test." *Smith*, 494 U.S. at 888, 110 S.Ct. at 1605. Even if a prison regulation meets the standard of a compelling interest, the prison must still prove that the regulation is the least restrictive means of achieving the stated interest. Thus, as long as a prison inmate can establish that a regulation im-

poses a substantial burden on his religious exercise, the prison regulation comes into court with a strong presumption of invalidity.

Moreover, the substantial burden requirement leaves a court very little power to narrow the cases that come to court. Courts are severely limited in evaluating whether the inmate's stated religious practice is worthy of RLUIPA protections, as the courts cannot give close scrutiny to the importance or centrality of the religious practice in question to the believer's faith. *See* 42 U.S.C. § 2000cc–5(7)(A) ("The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."); *see also Thomas v. Review Bd. of Ind. Employment Sec. Division*, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) ("Courts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might em-

---

**10.** The supporters of RLUIPA in Congress had no difficulty in asking courts to "continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Statement of Senators Hatch and Kennedy, 146 Cong. Rec. at S7775. However, this suggestion rings hollow when one considers that the strict scrutiny standard under RLUIPA is no different from that applied in any other strict scrutiny context.

Some courts, in examining prison regulations under RFRA and RLUIPA, have softened the compelling interest test to allow speculative administrative judgments concerning security and cost to suffice to allow the regulation to survive strict scrutiny. *See, e.g., U.S. v. Jefferson*, 175 F.Supp.2d 1123 (N.D.Ind. 2001); *Davie v. Wingard*, 958 F.Supp. 1244 (S.D.Ohio 1997); *Jones v. Roth*, 950 F.Supp. 254 (N.D.Ill.1996); *Jenkins v. Angelone*, 948

F.Supp. 543 (E.D.Va.1996); *Blanken v. Ohio Dept. of Rehabilitation and Correction*, 944 F.Supp. 1359 (S.D.Ohio 1996). Such an approach does restore the deference to the judgment of prison administrators valued so highly in *Turner* and *O'Lone*, but it leaves little of substance to the congressional vision of RLUIPA. It is also an approach that is dangerous for the protection of the constitutional rights of individuals outside of prison. Watering down strict scrutiny in a result-oriented manner in the prison context could "subvert its rigor in other fields where it is applied." *Smith*, 494 U.S. at 888, 110 S.Ct. at 1605; *see also Haff*, 923 F.Supp. at 1118 ("If the courts interpret RFRA to apply a weaker compelling interest test, they risk the compelling interest test becoming a platitude.... As some courts weaken the RFRA test, other courts may import the RFRA test in areas where the traditional compelling interest test is needed. Then, laws deserving the strictest scrutiny will receive a more lenient review.").

ploy."). As a result of the broad interpretation given to "religious exercise," a court must abide by the individual prisoner's subjective determination that a particular practice is a method of religious belief. *See Rouser v. White,* 944 F.Supp. 1447, 1454 (E.D.Cal.1996) ("[T]he Supreme Court has explained that the relevant question is not what others regard as an important religious practice, but what the plaintiff believes.").

RLUIPA, in placing religious inmates in such a position of power, requires a prison to measure "the effects of ... action on an objector's spiritual development," effectively making a religious inmate "a law unto himself." *See Smith,* 494 U.S. at 885, 110 S.Ct. at 1603. The "convenience or interests" of the prison system, an important element of the inquiry into an inmate's claim under the *Turner* test, has been eliminated in favor of a right to exemption closely resembling the "absolute and unqualified right" held by the employee in *Estate of Thornton v. Caldor. See* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (holding Connecticut law that prevented employers from requiring an employee to work on the employee's Sabbath unconstitutional as a violation of the Establishment Clause); *see also Smith* ("Precisely because 'we are a cosmopolitan nation made up of almost every conceivable religious preference,' and precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming presumptively invalid, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order."). While even strict scrutiny does not provide an "absolute" right of exemption to religious inmates, the tremendous level of protection provided by RLUIPA is evident in the numerous exemptions and privileges courts have required prison officials to

provide religious prisoners, and only religious prisoners, under the Act's strict scrutiny standard.

RLUIPA is just beginning to come into use by inmates bringing religious constitutional claims against prisons. However, federal courts have already found the following generally applicable and facially neutral prison regulations to be, or to have the potential to be, unconstitutional as applied to religious inmates under the RFRA[11] strict scrutiny test: (1) Grooming policies requiring hair to be worn short and beards to be cut, *Gartrell v. Ashcroft,* 191 F.Supp.2d 23 (D.D.C.2002); *Lewis v. Scott,* 910 F.Supp. 282 (E.D.Texas 1995); (2) Regulations requiring inmates to eat the common meal provided to them, *Luckette v. Lewis,* 883 F.Supp. 471 (D.Ariz. 1995); (3) Regulations requiring inmates to submit to a Tuberculosis screen, *Jolly v. Coughlin,* 76 F.3d 468 (2d Cir.1996); *Jihad v. Wright,* 929 F.Supp. 325 (N.D.Ind.1996); (4) Regulations prohibiting the wearing of jewelry, *Sasnett v. Sullivan,* 908 F.Supp. 1429 (W.D.Wis.1995); *Alameen v. Coughlin,* 892 F.Supp. 440 (E.D.N.Y.1995); *Campos v. Coughlin,* 854 F.Supp. 194 (S.D.N.Y.1994); (5) Regulations prohibiting the wearing of clothing not issued by the prison, *Muslim v. Frame,* 891 F.Supp. 226 (E.D.Pa.1995); (6) Rules of solitary confinement limiting the clothes that may be worn, *Hall v. Griego,* 896 F.Supp. 1043 (D.Colo.1995); *Luckette,* 883 F.Supp. 471; and (7) Rules prohibiting the possession of metal objects which can be fashioned into weapons, *Ramirez v. Coughlin,* 919 F.Supp. 617 (N.D.N.Y.1996).

Looking at the range of exceptions provided under the strict scrutiny test, it is not a logical stretch, in predicting the practical effects of RLUIPA, to imagine a prison in which religious prisoners are allowed to wear religious headgear and reli-

11. As stated previously, the strict scrutiny tests of RFRA and RLUIPA are identical.

gious icons, have ungroomed hair and beards, receive extremist literature from outside the prison, refuse to submit to general medical tests and vaccinations, keep religious objects in their cells, and receive special diets. Meanwhile, non-religious inmates in the same prison must be clean shaven, wear prison issued clothing, submit to medical exams, and eat whatever is provided in the cafeteria. If the non-religious prisoner wants the same freedoms that the religious inmate possesses, he has two choices. First, if a prison regulation, such as a limitation on the inmate's ability to receive and keep photographs deemed obscene by prison officials, arguably burdens his First Amendment freedoms, the inmate may choose to challenge the regulation under the deferential *Turner* rational relationship test. Second, the inmate could claim religious rebirth and cloak himself in the protections of RLUIPA, a possibility that concerned courts under RFRA. *See Sasnett,* 908 F.Supp. at 1444 ("Proof of religiosity is especially important in the prison context because of the potential that prisoners might use religion as a pretext to achieve other goals.").[12] Whatever choice the inmate makes, the practical effect of RLUIPA on the prison system in the United States is to grant religious and professed religious inmates a multitude of exceptions and benefits not available to non-believers.

Whether or not non-religious inmates actually feel pressure under RLUIPA to conform their beliefs to coincide with the protections of the Act, prison administrators' compliance with the Act and the various exceptions provided for religious prisoners under the Act send non-religious

inmates a message that they are outsiders of a privileged community. This effect is a clear violation of the Establishment Clause.

The core notion animating the requirement that a statute possess "a secular legislative purpose" and that "its principal or primary effect ... be one that neither advances nor inhibits religion," is not only that government may not be overtly hostile to religion but also that it may not place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general, compelling non-adherents to support the practices or proselytizing of favored religious organizations and conveying the message that those who do not contribute gladly are less than full members of the community. *Texas Monthly,* 489 U.S. at 9, 109 S.Ct. at 896 *(citing Wallace,* 472 U.S. at 69, 105 S.Ct. at 2496 (O'Connor, J., concurring) ("Direct government action endorsing religion or a particular religious practice is invalid ... because it 'sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'")); *see also Amos,* 483 U.S. at 348, 107 S.Ct. at 2875 (O'Connor, J., concurring).

The political community affected by RLUIPA in the present case is a unique one, as members of this community are already in a position in which conformity is a mandated norm. *See Amatel,* 156 F.3d at 198 ("Prisoners of course differ from the other examples of individuals entangled

---

12. Even if courts interpret RLUIPA in a manner that weakens the strict scrutiny standard in order to continue to give great deference to prison administrators, the ease with which a prisoner is able to come to court under RLUIPA continues to give the religious prisoner a place in the prison community that is privileged relative to the non-believer. The cost of litigating RLUIPA claims will lead prison administrators to give more weight to a regulation's effect on religious inmates than to the effect on non-religious inmates in promulgating a regulation.

with the government in that they have no recourse to a private sphere. For them, there is no outside. Judges plainly must bear in mind the total occupation of prisoners' lives by the state."). Rules are dictated to inmates by prison administrators, and obedience is supported by the power of forcible retribution. In such a community of limited freedoms, exceptions to prison rules and regulations are fervently sought after by prisoners, and even the smallest exceptions, including religious exceptions, can lead to feelings of jealousy among fellow inmates. *See DeHart,* 227 F.3d at 52–53 (recognizing how the provision of special religious diets can lead to inmate jealousy); *Johnson v. Horn,* 150 F.3d 276, 282 (3d Cir.1998) (holding that the request of a religious inmate for a special diet causes other inmates to think that the religious inmate is receiving special treatment, leading to harassment); *Garrett v. Gilmore,* 926 F.Supp. 554, 557 (W.D.Va.1996) (recognizing that allowing exceptions to prison regulation "easily" engenders jealousy among inmates); *Udey v. Kastner,* 644 F.Supp. 1441, 1447 (E.D.Tex. 1986) (warning that the provision of exceptions leads to numerous inmate claims), *aff'd,* 805 F.2d 1218 (5th Cir.1986).

However, as seen by the exceptions made for prisoners under RFRA, this is not a question of small, single exceptions. RLUIPA forces prison administrators to focus specifically on the needs of religious prisoners, providing a number of exceptions to religious inmates from generally applicable prison regulations. While it is true that the exceptions religious inmates receive through RLUIPA do not provide them absolute, unqualified freedom, the level of power it provides them is not judged in a vacuum under the objective observer test. Rather, the power that a congressional act provides to a religious inmate must be analyzed in relation to the position of non-religious inmates in prison society. Under RLUIPA, whether the dif-

ference between religious and non-religious inmates exists in tangible privileges or the mere right to gain greater attention from prison administrators and the courts, religious inmates have far greater governmental support and power than non-religious inmates whose lives and rights are completely dominated by prison administrators. *O'Lone* and *Turner* give little comfort to those non-believers who must eat a common diet, undergo ordinary medical examinations, have their mail censored, and have their worldly possessions taken away from them, all the while witnessing religious inmates being exempted from the reach of these rules. An objective inmate, as opposed to an objective congressman or judge, would have no doubt that RLUIPA has established religious inmates as "favored members" of the prison community.

As all of the rights of inmates are burdened under the prison system, this is not an example of a law that an objective observer would see as merely lifting a burden imposed only on religion. *See Amos,* 483 U.S. at 348, 107 S.Ct. at 2874–75 (O'Connor, J., concurring). Non-religious prisoners would continue to be limited in the manner in which they are able to exercise and protect their fundamental rights after the passage of RLUIPA. However, the privileged status of religion inmates, through the use of an elevated level of legal protection, will constantly be on display in the exceptions that prison administrators and courts will be forced to make for them under the Act's strict scrutiny level of review. The manner in which Congress has placed its power behind religious belief, privileging religious inmates in the prison community, is a clear violation of the *Lemon* test, adding support to the conclusion that section 2000cc–1 of RLUIPA violates the Establishment Clause.

## Conclusion

It is often difficult to determine the lines of demarcation between free exercise and establishment, and accommodation and promotion, but RLUIPA does not appear to be a close case. The Act, as it relates to the constitutional claims of religious inmates, raises the level of protection of religious rights only, leaving other, equally fundamental rights languishing under the pressure of judicial deference to the decisions of prison officials. When applied to prison inmates, to whom privileges and exceptions to prison regulations are few, the different standards of review have the effect of establishing two tiers of inmates in the prison system: the favored believer and the disadvantaged non-believer. It is this precise result that the *Lemon* test and the Supreme Court's Establishment Clause jurisprudence seek to prevent, and it is therefore the obligation of this Court to declare the section of RLUIPA that pertains to prison inmates, section 2000cc–1, UNCONSTITUTIONAL.

The Court recognizes that the issues addressed in this decision regarding the constitutionality of section 2000cc–1 of RLUIPA involve a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from the Court's decision to the United States Court of Appeals for the Fourth Circuit, pursuant to 28 U.S.C. § 1292(b) (2002), may materially advance the ultimate termination of the litigation. Accordingly, the Court certifies the issue of the constitutionality of section 2000cc–1 of RLUIPA for interlocutory appeal to the Fourth Circuit.

## *ORDER*

This matter is before the Court on the Defendants' Motion to Dismiss the Plaintiff's claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1 (2002), on the basis that the Act violates the United States Constitution. The Court heard oral arguments from the parties and the United States Government as intervener on November 26, 2002. As explained more fully in the accompanying memorandum opinion, it is hereby

## ADJUDGED AND ORDERED

(1) that section 2000cc–1 of RLUIPA, the section of the Act governing the claims of prison inmates, is **UNCONSTITUTION-AL** as a violation of the Establishment Clause;

(2) that the Plaintiff's RLUIPA claim is hereby **DISMISSED**; and

(3) that the issue of the constitutionality of section 2000cc–1 is **CERTIFIED** for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).