In the

# United States Court of Appeals

### For the Seventh Circuit

No. 02-3572

JERRY CHARLES,

*Plaintiff-Appellee,*

*v.*

RICHARD J. VERHAGEN and
MATTHEW J. FRANK,

*Defendants-Appellants,*

and

UNITED STATES OF AMERICA,

*Intervenor.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 01 C 253—**Barbara B. Crabb**, *Chief Judge.*

ARGUED MAY 15, 2003—DECIDED OCTOBER 30, 2003

Before BAUER, COFFEY, and DIANE P. WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff Jerry Charles, a Muslim inmate, filed an action against officials with the Wisconsin Department of Corrections' Division of Adult Institutions (collectively, "DOC"), alleging separate violations of his First Amendment right to the free exercise of religion as well as the Religious Land Use and Institution-

alized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), because DOC officials prohibited him from possessing Islamic prayer oil in his cell and from celebrating more than one religious feast per year. The district court granted summary judgment in favor of the DOC on both of Charles' First Amendment claims and on his religious-feast claim under RLUIPA.

The court, however, held that the DOC violated RLUIPA by refusing to allow Charles to possess a reasonable quantity of prayer oil but reserved judgment on the DOC's constitutional challenge to RLUIPA in order to allow the United States to intervene and defend the statute. Following intervention by the United States, the district court held that RLUIPA was a constitutional exercise of Congress' power under the Spending Clause and that it did not violate the Tenth Amendment or the First Amendment's Establishment Clause. As a result, the court entered summary judgment in favor of Charles on his prayer oil claim under RLUIPA. We affirm.

## BACKGROUND

Charles is a practicing Muslim inmate at the Oshkosh Correctional Institute, a medium-security prison operated by the DOC. According to Muslim practices, Charles prays five times a day and undergoes ritual cleansing or purification, in part to eliminate offensive body odors prior to prayer.[1] This ritual cleansing often involves the application of fragrant prayer oil. In April 2001, the DOC implemented two, revised Internal Management Procedures

---

[1] Apart from its religious implications, this strikes us as a good thing for all involved in the prison setting—or indeed, anywhere else.

("IMPs"), #6 and #6A.[2] These IMPs addressed "Religious Beliefs and Practices" and "Religious Property," respectively.

IMP #6 identified seven "umbrella religion groups" (including Protestant, Muslim, Native American, Catholic, Jewish, Buddhist, and Wiccan) and established procedures and guidelines for each group. IMP #6A addressed the quantity and type of religious property that each inmate could possess in DOC institutions and listed specific, approved items for each umbrella religion group. Inmates purchase religious and other personal property with personal funds, managed by the correctional institution in which the inmate is being held. IMP #6A lists religious books and publications, prayer beads, a prayer rug, and a kufi cap as approved items for Muslim inmates but does not list Islamic prayer oil. DOC officials, therefore, prohibited Charles from possessing any such oil, though other kinds of fragrant body oils and lotions were made available to inmates.

The DOC received approximately 14.5 million federal dollars in fiscal year 2001, which comprised roughly 1.6% of DOC's annual budget, none of which was directed to religious programs. Each time an inmate seeks to purchase a personal property item, the DOC must follow extensive bureaucratic procedures. These procedures are designed to ensure that the requested item is permissible; not a security threat; properly ordered, received, and inventoried by various prison officials; and delivered undamaged to

---

[2] The DOC claims that severe overcrowding and a quadrupling of the State's prison population over the last twenty years, forcing approximately 4,000 inmates to be placed in out-of-state contract bed facilities, contributes to the difficulties of prison management and necessitates streamlined procedures for handling things such as inmates' personal property. Hence, the DOC revised IMPs #6 and #6A.

the inmate upon receipt at the correctional institution or following an inmate's transfer between DOC facilities. According to the DOC, in developing IMP #6A, DOC officials consulted and conducted research with religious leaders in order to identify specific, allowable religious property and to create fairness among religious faiths.

Congress enacted RLUIPA following the Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507 (1997), which struck down the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb to 2000bb-4, under the Fourteenth Amendment insofar as it applied to states and localities. Similar to RFRA, Congress enacted RLUIPA, in part, to protect inmates and other institutionalized persons from substantial burdens in freely practicing their religions. Specifically, RLUIPA provides that,

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a) (2000).

Rather than rely on the Fourteenth Amendment, Congress invoked the Spending and Commerce Clauses and hinged the applicability of RLUIPA on whether: "(1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or (2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C.

§ 2000cc-1(b). If the sole basis for the applicability of RLUIPA rests in the Commerce Clause power, a defendant can assert an affirmative defense that RLUIPA is inapplicable if the burden at issue "would not lead in the aggregate to a substantial effect on interstate commerce." 42 U.S.C. § 2000cc-2(g). Finally, RLUIPA creates a private right of action for individual prisoners and grants the United States power to enforce the statute through injunctive or declaratory relief. 42 U.S.C. § 2000cc-2(a), (f).

## ANALYSIS

We undertake a de novo review of the district court's grant of summary judgment in favor of Charles, because the parties do not dispute any material facts and present only questions of law for our consideration. *O'Kane v. Apfel*, 224 F.3d 686, 688 (7th Cir. 2000). Rather than argue the merits of Charles' prayer oil claim under RLUIPA, the DOC urges this Court to determine that Congress' enactment of RLUIPA runs afoul of its Spending and Commerce Clause powers, the Tenth Amendment, and the Establishment Clause of the First Amendment. We review each claim in turn.

### A. Spending Clause Authority

As a starting point, we note that the parties do not dispute that if RLUIPA is constitutional it would apply in this case because the DOC receives federal funding. 42 U.S.C. § 2000cc-1(b). The United States Constitution gives Congress the power to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the Common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. The Supreme Court has held that Congress may attach conditions to the receipt of federal money incident to its Spending Clause

power. *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). These conditions may be imposed in order to further broad policy objectives, but Congress' power is not unlimited. *Id.* at 206-07.

First, under the plain language of the Constitution, use of the Spending power must be in pursuit of "the general Welfare." U.S. CONST. art. I, § 8, cl. 1; *Dole*, 483 U.S. at 207. Courts should defer substantially to Congress' determination as to what lies within the general welfare. *Dole*, 483 U.S. at 207. Second, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id.* Third, any conditions attached to federal funding must be related to a federal interest. *Id.* And fourth, "other constitutional provisions may provide an independent bar to the conditional grant of federal funds." *Id.* at 208.

### 1. *Pursuit of the general welfare*

The Court of Appeals for the Ninth Circuit recently held that RLUIPA satisfies the first part of the *Dole* test in that Congress' attempt to protect prisoners' religious rights is in line with the protections afforded by the Constitution through the First Amendment's Free Exercise Clause. *Mayweathers v. Newland*, 314 F.3d 1062, 1066-67 (9th Cir. 2002). RLUIPA follows in the footsteps of a long-standing tradition of federal legislation that seeks to eradicate discrimination and is "designed to guard against unfair bias and infringement on fundamental freedoms." *Id.* at 1067 (citing to Titles VI and VII of the Civil Rights Act of 1964, which protect against numerous forms of discrimination in any program receiving federal financial assistance and in employment, respectively, and citing to Title IX, which sought, in part, to eliminate gender

inequities in education). Given the Supreme Court's directive to defer substantially to Congress' judgment, we agree with the Ninth Circuit that RLUIPA's attempt to protect prisoners' religious rights and to promote the rehabilitation of prisoners falls squarely within Congress' pursuit of the general welfare under its Spending Clause authority.

### 2. *Unambiguous conditions*

The second part of the *Dole* test requires that Congress make unambiguous the presence of any conditions attached to the receipt of federal funds. *Dole*, 483 U.S. at 207. Under the plain language of RLUIPA, Congress conditioned the receipt of federal money upon States refraining from creating substantial burdens on prisoners' religious rights that are not justified by a compelling governmental interest and are not furthered by the least restrictive means possible. 42 U.S.C. § 2000cc-1(a). The Supreme Court has directed that "[t]he crucial inquiry, however, is . . . whether Congress spoke so clearly that we can fairly say that the State could make an informed choice." *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). As the *Mayweathers* court noted,

> Congress is not required to list every factual instance in which a state will fail to comply with a condition. Such specificity would prove too onerous, and perhaps, impossible. Congress must, however, make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious.

*Mayweathers*, 314 F.3d at 1067. Thus, the exact nature of the conditions may be "largely indeterminate," provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required. *Id.* (citing *Pennhurst*, 451 U.S. at 24-25).

The DOC argues that RLUIPA's conditions are ambiguous because the statute employs a "least restrictive means" test. According to the DOC, *Pennhurst* stands for the proposition that the least restrictive means test is too indefinite a standard under which to impose conditions upon the receipt of federal funding. In other words, there is too much guesswork involved.

The DOC's reading of *Pennhurst*, however, is not one we are willing to adopt. At issue in *Pennhurst* was whether the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6000 *et seq.*, had as a condition of accepting federal funding the requirement that States provide "appropriate treatment" to disabled residents in the "least restrictive environment." *Pennhurst*, 451 U.S. at 18. The lower courts had held that the statute created substantive rights in favor of residents to receive that type of treatment. *Id.* The Supreme Court found otherwise, concluding that language regarding "appropriate treatment" and the "least restrictive environment" merely reflected Congress' justification, or policy goals, for appropriating federal money to the States through the Act, not conditions associated with the receipt of federal funds. *Id.* at 19, 23. Further, other portions of the Act more clearly spelled out the conditions attached to the receipt of federal funding than the language at issue in *Pennhurst*. *Id.* at 23. Accordingly, the Court stated that it "strains credulity" to argue that States should have known of the supposed obligations imposed by Congress for which the disabled residents were arguing. *Id.* at 25.

As for RLUIPA, we find that Congress clearly and unambiguously attached conditions to the acceptance of federal funding for prisons, and that the State of Wisconsin, particularly the DOC, was put on notice of those conditions. As the *Mayweathers* court noted, Congress cannot delineate every instance in which a State may or may not comply with the least restrictive means test; it

is simply impossible to do. There are far too many circumstances affecting the States in different ways for Congress to have envisioned all aspects of compliance and noncompliance. Rather, Congress permissibly conditioned the receipt of federal money in such a way that each State is made aware of the condition and is simultaneously given the freedom to tailor compliance according to its particular penological interests and circumstances. If the DOC objected to the imposition of the least restrictive means test, it certainly could have refused federal funding.

### 3. *Conditions must be related to a federal interest*

The *Dole* Court's third requirement is that any conditions attached to federal funding be related to a federal interest. *New York v. United States*, 505 U.S. 144, 167 (1992); *Dole*, 483 U.S. at 207. We discussed above the relationship between RLUIPA and Congress' pursuit of the general welfare and pause here to note again how that relationship contributes to the third *Dole* factor. Congress has an interest in allocating federal funds to institutions that do not engage in discriminatory behavior or in conduct that infringes impermissibly upon individual liberties. In the context of protecting prisoners' religious rights, Congress also seeks to promote the rehabilitation of prisoners, a process in which religion can play an important role. *Mayweathers*, 314 F.3d at 1067; *see also Freedom from Religion Found., Inc. v. McCallum*, 324 F.3d 880, 882, 883-84 (7th Cir. 2003) (noting importance of religion to the rehabilitation of some substance abusers in rejecting an Establishment Clause challenge to Wisconsin's use of faith-based halfway house for parolees).

The DOC argues that the conditions imposed by RLUIPA cannot be related to a federal interest because the DOC does not allocate any of its federal funding specifically to religious programs in prisons and because federal funds

comprise roughly 1.6% of the DOC's annual budget. Those arguments are misplaced. First, the Supreme Court's decision in *Dole* upheld the conditioning of federal highway funding upon a State establishing a minimum drinking age. *Dole*, 483 U.S. at 208. Indeed, a minimum drinking age requirement and federal highway funds shared the same goal—interstate travel safety. *Id.* Likewise, the goal of federal corrections funding and the conditions imposed by RLUIPA, with respect to the protection of prisoners' religious rights, share the goal of rehabilitation. That the DOC does not allocate federal funding specifically to religious programs is of no moment. Second, the cases to which the DOC cites in support of its argument that it receives too little federal money to be bound by the conditions of RLUIPA are inapposite; they do not even concern the Spending Clause. Nothing within Spending Clause jurisprudence, or RLUIPA for that matter, suggests that States are bound by the conditional grant of federal money only if the State receives or derives a certain percentage (and, according to the DOC, an amount substantially higher than the 14.5 million dollars it received in 2001) of its budget from federal funds. If a State wishes to receive any federal funding, it must accept the related, unambiguous conditions in their entirety. Accordingly, we find that the conditions imposed by RLUIPA are properly related to an important federal interest.

### 4. *Independent Constitutional bar*

The final part of the *Dole* test recognizes that "other constitutional provisions may provide an independent bar to the conditional grant of federal funds." *Dole*, 483 U.S. at 208. The DOC's remaining arguments are that RLUIPA violates Congress' Commerce Clause authority, the Tenth Amendment, and the Establishment Clause. Be-

cause we find that RLUIPA is valid under the Spending Clause, we need not involve ourselves in arguments concerning the Commerce Clause. Whether or not the Commerce Clause provides an independent *justification* for RLUIPA does not impact its constitutionality under the Spending Clause. Accordingly, the Commerce Clause could not provide an independent bar to the enactment of RLUIPA.[3]

Similarly, when Congress engages in a constitutional use of its delegated Article I powers, the Tenth Amendment does not reserve that power to the States. U.S. CONST. amend. X; *New York*, 505 U.S. at 156; *United States v. Wilson*, 159 F.3d 280, 287 (7th Cir. 1998). In other words, the Tenth Amendment does not restrict the range of conditions Congress can impose on the receipt of federal funds, even if Congress could not achieve the goal(s) of those conditions directly. *Dole*, 483 U.S. at 210. The Supreme Court's reference to an independent constitutional bar "stands for the unexceptionable proposition that the power may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id.* The DOC's final hope, therefore, is that we find that RLUIPA violates the First Amendment's Establishment Clause, thereby providing an independent bar to RLUIPA's conditions.

---

[3] We further note, though no party mentioned this fact, that the DOC admitted to sending approximately 4,000 of its inmates to out-of-state facilities because of overcrowding. The DOC does not contend, nor would we expect, that IMPs #6 and #6A do not apply to these inmates simply because they are housed out of the state. That fact, in our view, lends validity to RLUIPA's constitutionality under the Commerce Clause in this case. The DOC certainly engages in interstate commerce to properly handle the requests for religious and other personal property from inmates housed outside Wisconsin.

## B.  *Establishment Clause Violation*

The Establishment Clause provides that, "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I. The Supreme Court developed a three-part test in order to discern whether Congress has violated the Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). The DOC argues that RLUIPA violates only the second part of the *Lemon* test in that the statute impermissibly exalts religion by creating a right for religious prisoners that is not needed to remove a Free Exercise violation and a right that runs counter to a reasonable penological interest—maintaining prison order and security.

The Supreme Court has stated, however, that "the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987) (upholding exemption of religious organizations from Title VII's prohibition of religious discrimination in employment). With respect to the second part of the test, "[f]or a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Id.* at 337 (emphasis in original). Thus, "there is ample room under the Establishment Clause for benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994) (citing *Amos*, 483 U.S. at 334) (internal quotation marks omitted).

The DOC argues that RLUIPA creates rights in favor of religious inmates while excluding non-religious inmates and ignoring the State's right to administer its correctional system as it sees fit. When the "government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities." *Amos*, 483 U.S. at 338. Borrowing from the Ninth Circuit again, we too adopt the position that RLUIPA

> does not violate the Establishment Clause just because it seeks to lift burdens on religious worship in institutions without affording corresponding protection to secular activities or to non-religious prisoners. RLUIPA merely accommodates and protects the free exercise of religion, which the Constitution allows.

*Mayweathers*, 314 F.3d at 1069 (citing *Amos*, 483 U.S. at 338.).

Finally, a provision of RFRA nearly identical to the one at issue in RLUIPA has been held constitutional under the Establishment Clause by this Circuit and several others. *In re Young*, 141 F.3d 854, 862-63 (8th Cir. 1998); *Sasnett v. Sullivan*, 91 F.3d 1018, 1022 (7th Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 470 (D.C. Cir. 1996); *Flores v. City of Boerne*, 73 F.3d 1352, 1364 (5th Cir. 1996), *rev'd on other grounds*, 521 U.S. 507 (1997). The reasoning behind RFRA's validity under the Establishment Clause applies with equal force to RLUIPA's constitutionality.

The requirements of RLUIPA cannot fairly be said to amount to government advancement of religion through the government's own activities or influence. RLUIPA seeks to remove only the most substantial burdens States impose upon prisoners' religious rights, while giving States' penological interests due consideration. The statute does not promote religious indoctrination, nor does it

guarantee prisoners unfettered religious rights, and not every challenge under RLUIPA will be deemed valid.[4]

Because the enactment of RLUIPA does not exalt belief over nonbelief, the statute also does not create rights for religious inmates that do not exist for non-religious inmates. The DOC argues that RLUIPA is problematic because its "accommodation" of religious property somehow increases the overall quantity of personal property that inmates are entitled to possess. RLUIPA, however, does not unnecessarily extend the limit the DOC imposes on the amount of religious property an inmate can possess in his cell. We see nothing in the statute's provisions prohibiting the DOC from requiring the removal of a non-religious item should an inmate wish to possess a religious item to which RLUIPA entitles him. And, we sincerely doubt that courts will increase exponentially the amount of religious property to which inmates are entitled by virtue of RLUIPA's protections (thereby mandating the State to allow prisoners to exceed any limit on personal property) in light of States' interests in maintaining order and security. It happens in this case, however, that the DOC appeals only the district court's determination as to the constitutionality of RLUIPA, ignoring how the court resolved the merits of Charles' claim for prayer oil.

Accordingly, we find that Congress did not violate the Establishment Clause of the First Amendment by its

---

[4] In fact, Charles' claim that the DOC violated RLUIPA by allowing him to celebrate only one religious feast per year was rejected by the district court because the court found that, although the restriction created a substantial burden to Charles' religious rights, allowing only one feast for each "umbrella religion group" was the least restrictive means of furthering the compelling interest for prison order and security; a decision Charles does not appeal to this Court.

enactment of RLUIPA. There being no independent consti-
tutional bar to the statute, it remains a valid exercise
of Congress' Spending Clause authority, and the district
court's decision to award summary judgment in favor
of Charles on his prayer oil claim under RLUIPA is
AFFIRMED.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*